We have a student group who is hoping to observe court today, so we're. They're running very late, so they're not going to come till after. Got it. OK, so never mind. We'll move to the second case. All right, so our second case for argument is Mohammed Albadarneh v. Bondi. Good morning. Good morning, Your Honors. May it please the Court, I'm Kathleen Foley here on behalf of Petitioner Mahmoud Jad Allah Mohammed Albadarneh. I'd like to reserve three minutes for rebuttal, please. Mr. Albadarneh's intended bride was murdered, and her murderers swore to kill him, too. In their quest to make good on those threats, they invaded his home, assaulted his family, and surveilled and threatened his family, even after they fled several hours away. Let me stop you for just a second. All of those things, if they actually occurred, are horrible, despicable, and there's no question about it. The only evidence, however, we have of any of these things happening, largely, are your client, number one, saying that, and this somewhat unusual letter from his brother, which doesn't even cover all of these issues. And the judge below found your client lacked credibility. So how do we know any of these things occurred in reality? Well, so a few points on that, Your Honor. The IJ's adverse credibility determination was premised largely, although not entirely, on the results of the faulty translation that occurred in the context of that hearing. And I think it's important to note here that the government doesn't dispute that the translation that occurred was faulty or that my client was prejudiced by that faulty translation. So I think that it'd be appropriate for this court to set aside four of the IJ's six bases for that adverse credibility determination. And I think the additional two bases on which the IJ relied were the omissions of details from my client's application for immigration relief, and those cannot, under this court's precedence, suffice to substantiate an adverse credibility determination. Well, the main and the most serious, to my knowledge, and again, I only have the record in front of me, was the suggestion that he was having intimate relations with this girl. He was caught having an intimate relationship with the girl, the young woman, versus just sitting there and talking to her, right? So that is one of the two pieces of evidence of that. But let's assume for just a moment that what really happened here is what he now says happened. He was just sitting and talking to her, right? That's always been what he said happened. And it seems a little extreme, I mean, that she would be killed and he would be chased down and with the thought of killing him simply because they were caught speaking. I mean, doesn't that seem, I mean, even for the Taliban, that seems a little bit, and we're not talking about the Taliban here, it seems a little extreme. There are many punishments like their famous public whippings and all this other stuff that goes on that would more than suffice. I mean, you wouldn't kill somebody. Obviously, if somebody was caught having in the middle of a sexual encounter, you could understand where, not approve of, but understand where that might happen. But to sit and talk? I agree that it seems extreme, Your Honor. And as reflected in the State Department report, women are subject to honor killings for being the victims of sexual assault. And that equally seems extreme. Can I, I'm sorry, I was under the impression that he was in a relationship with her and wanted to marry her, and not that they were just, you know, strangers sitting on a bench. And maybe this is an aspect of, I read through the transcript and had some difficulty trying to discern what was actually, what he was actually trying to say. Can you clarify? Is it as Judge Ezra just posited, just two people sitting on a bench, or did they have a preexisting relationship that wasn't sexual in nature? But that was leading toward marriage. The latter, Your Honor. So Petitioner testified that he and Ms. Kluf wanted to get married and he referred to them as a couple. And the English words girlfriend and romantic relationship as used on his application are apt. But in the context of the hearing, when he heard those words translated into Arabic by the government's interpreter, he denied their applicability. And this is perhaps clearest on page 146 of the record, where he said, that's what I said, that she was my friend and we wanted to get married. That's not a romantic relationship and things like that. And Petitioner's pro se brief to the BIA tells us why he rejected those terms. He believed that girlfriend and romantic relationship, again, as he heard them translated into Arabic by the government's interpreter, meant that the two had a sexual relationship and perhaps were even caught in flagrante. And Perez-Lastor noted that direct evidence of mistranslated words is very difficult to discern. Well, he denies that that happened, doesn't he? He denies that what happened, I'm sorry. That they were actually caught in the act. Yes, he denies that that happened, but if you look at the English language transcript. My point was, I understood, as Judge Sanchez correctly pointed out, that there's now this suggestion that he might've had a more deep relationship with her, but when they were caught, they were actually just caught talking. Yes, and he testified to that consistently. He did not change his story with respect to that. But we focus on that in our brief because that is an example, perhaps the clearest example of a direct mistranslation of words. And that's just one of three pieces of evidence that in Perez-Lastor, this court said, shows a faulty translation. And the other two types of evidence are present here as well. And so those are unresponsiveness by the petitioner to the IJ's questions, and the petitioner's expression of a lack of understanding in the context of the hearing of what was going on. Can you point me in the record to where the petitioner raised the question of translation of the hearing to the agency? So I would point to the petitioner's BIA brief, which is, I believe, at pages five to seven, or six to eight of the record. So in the context of, he wrote a 584-word brief with the assistance of a translator because he doesn't speak any English. And he used the words, I tried to explain, four times. He said three times the judge didn't listen to him or wouldn't listen to him. He notes that he didn't speak English. He says that he tried to clarify his answers and he wasn't allowed to do so. So that seems to me different than a translation problem. I mean, you could say, the immigration judge wasn't listening to me. I was trying to give my side of the story and I was being cut off and I wasn't being allowed to present my position. That's different than saying, we weren't able to communicate because the translation wasn't accurate or I didn't understand it. That's totally different. So I'm coming back to where in the record is the agency made aware of your client's position that something happened with the translation at the hearing? Petitioner did all he could with what he had in front of him in the position he was in to alert BIA to the fact that he wasn't able to communicate. And the BIA had enough before it to discern that that was because of a translation problem. So the fact that he said he doesn't speak English, the fact that he said he tried to explain over and over again. I don't think it's reasonable to require him to have done more than he did in this context. I guess I don't understand that. I don't understand. I mean, of course, when we are dealing with somebody who doesn't have legal counsel, of course, we look at that differently and a little bit more liberally. And that particularly applies when we're talking about sort of the framing of arguments or positions in legal terms, right? We don't expect non-lawyers to perfectly understand how to present something in a legal way and use magic words, so to speak. But when it comes to just saying, what do you think was wrong? What do you think happened that shouldn't have happened? That's not a legal issue. That's just like, tell us what is the problem that you want us to fix. And when he says only, I wasn't able to tell the IJ, the IJ wasn't listening to me and I don't speak English, why does that give him the benefit of now being able to argue the translator was not qualified or wasn't doing a good job? Like, I just don't see how those things even follow from each other. He raised to BIA his inability to communicate. And he, in other words, he raised the results of the due process challenge or put another way, the general issue, which was his inability to communicate. And he could not have done more in this circumstance. Well, he could have said, I didn't understand what the translator was telling me. Perhaps he did understand what the translator was telling him, but the translator wasn't accurately translating what the IJ said or wasn't accurately translating what he said in response. And he would have no way to know that. He was detained. He was pro se. He didn't speak English. What he had before him was the English language transcript of what occurred in these proceedings to require him to do more than what he did, which is to communicate. I couldn't make myself understood. I tried over and over again. The judge wasn't listening to what I was saying. I didn't speak English. I tried to clarify. I wasn't allowed to. Would be to require the impossible. And this court has said repeatedly that where exhaustion is impossible, it's not required. Well, I mean, he did bring up translation problems with the asylum application and said that he wasn't able or given a chance to explain at the hearing what was wrong with those translation problems. And so he is bringing up translation in a sense, but he's laying the blame at the feet of the earlier translator, as opposed to this inability to explain what's going on during the hearing. Under a liberal construction, I take it you're, you know, you say that's, that should be enough for a pro se litigant. I think that should be enough for a pro se litigant, but even if the court didn't agree with that, I think that he put the issue of translation interfering with his ability to communicate before the BIA. And I would note to the extent the court is troubled by, you know, he was able to say that the translator worked on this application was faulty, but not the one of the BIA. I would note that he had an opportunity, unlike with the translation at the hearing, to understand that what was put on his application was not a faithful reproduction of what he'd said. Because A, number one, the translation was, the application was read back to him in Arabic. And two, at the hearing, he was confronted with the fact that what it said on his application did not reflect, at least as far as he heard it through the government's interpreter, what he had told the translator who worked on his application. Assuming there were serious enough flaws with the translation, why was it prejudicial to him? Why does he satisfy the prejudice standard? So first, I want to just note again, the government doesn't dispute at all that the translation was faulty. So I don't know the court needs to make any findings on that because it's a waived issue. But in any event, the IJ didn't credit Petitioner's testimony despite saying that he was, and sort of continuing with this in making an alternative finding. He didn't credit his testimony regarding the hospitalization of Petitioner's mother, regarding the Jordanian police's refusal to intervene in tribal affairs, regarding the Kloof's petitions in government, regarding the second attack, and indeed, Ms. Kloof's murder were things that the IJ didn't credit and address in his merits analysis. Unless the court has further questions, I'll reserve the rest of my time for a while. Thank you.  Good morning, Your Honors. May it please the court. Anitan Tayotunla on behalf of the respondent, the U.S. Attorney General. This court should deny the petition for review for three reasons, Your Honor. First, the Petitioner did not exhaust the due process issue by providing meaningful notice to the Board of Immigration Appeals. Second, the record does not compel reversal of the agency's adverse credibility determination where the IJ found six cogent and specific inconsistencies and the Board of Immigration Appeals summarily affirmed them. And third, even assuming Mr. Albarnet's credibility, the record does not compel reversal of the agency's merits denial of asylum and withholding where Petitioner, firstly, did not establish that any harm that he experienced rose to the level of past persecution where Mr. Albarnet, too, did not show that it was not safe and reasonable to relocate within Jordan. And three, he did not show that the Jordanian government is unable or unwilling to protect him from the Kluvkan. If I may, Your Honor, start with my first argument. Responding to the issue of exhaustion, I would first like to clarify that the government didn't take any position on the due process issue because the government argued that the issue was not exhausted. So we didn't address that in our brief, not wanting to waive our exhaustion argument, and also because the agency who issued the decision didn't make any findings on due process. And so we're only able to, based on the record, make arguments. I'm curious about how the different issues relate here. If we were to say that the translation challenge was sufficiently exhausted that we could address it on the merits, how would we say that that could be harmless because there was sufficient support for the agency's adverse credibility determination? So if the hearing, if we can't trust that the translation of the hearing was proper and that communication was proper during that proceeding, how could we say that the record nonetheless supports the adverse credibility finding? Because what can we trust about that record if the translation is problematic? Yes, Your Honor. So assuming that the court disagrees and does find that there was a due process violation, the agency did a dispositive alternative merits decision which assumed Mr. Albarne's credibility. And so in that analysis, the immigration judge credited everything Mr. Albarne said, that he was found on a bench with this young lady, that this young lady was killed as a result of that. The IJ considered that Mr. Albarne was threatened by this lady's family, that he was struck at least three times by this lady's family, that his home was shot at, nobody was harmed, his mother was hospitalized as a result of a second incident, that his family had to escape and live with the uncle. The immigration judge and the board considered all these factors and found that even taking into account and assuming Mr. Albarne's credibility, that he wasn't able to show that that harm rose to the level of persecution, that he was not able to relocate because- But usually when we find these due process violations, don't we vacate and remand for a new trial? Because it just, the very basis of the due process analysis is that it calls into question the fundamental fairness of what happened at the proceeding. So I mean, to echo Judge Forrest's point, it would seem as if we went there, it would seem to need a new hearing in order to flesh out what the full scope of the evidence was and the merits of the claims in that light. So Your Honor, again, I respectfully push back on that and say that assuming that even we're not waiving or conceding that there was a due process- No, I understand. But assuming that there is, there would still be no need. When the record, and I understand, I believe I understand Judge Sanchez and Judge Forrest, your concerns with the manner in which Mr. Albarne's merits hearing was conducted. But when you do read the transcript, I find that the immigration judge was scrupulous and meticulous in ensuring that Mr. Albarne had a full and fair hearing. He had an interpreter. He was fully advised of his rights. He, at every opportunity, he was allowed, at any opportunity that he said that he didn't understand a question, the question was repeated. He was allowed the opportunity to respond. I will say, I read the transcript this morning from beginning to end, and there were many instances where it did seem that there were translation issues. You know, the immigration judge would ask a question and there would be this non-sequitur answer. There would be, I don't understand. Just, there are so many instances of this. I think counsel has pointed to some more, some of the more serious ones that led to adverse credibility findings, such as this romantic relationship issue, for example, that if he construed it to mean sexual relationship and said, no, I was not in a romantic relationship, but that contradicts his asylum application where he says that he did have a girlfriend in a romantic relationship, that was the basis for an adverse credibility finding. And then similarly, there was this whole discussion about when did he speak with his family? And the translator in the hearing, as I remember reading, at first said in the sixth month, which would suggest before he filed his asylum application, or six months before the removal hearing, which would mean afterwards. So, I don't know. I think we need to get to the exhaustion issue because that's a very turning point issue with all this, whether this was properly exhausted. But as far as the translation problems, it really does call into question what to understand, you know, whether he had competent translation services in order to convey, in his view, what actually happened. Your Honor, if I may first address your issues with the translation and then get back to the exhaustion. So, to your point, the omissions that Petitioner is arguing were found, or that occurred purportedly at the immigration judge's hearing, I think it's a bit of a stretch to argue that there was a due process violation based on omissions from his 589 application. That 589 application was prepared totally in different circumstances. There was no immigration judge. It happened months before he appeared before the court. And so, any omission, you know, he completed that application with the assistance of somebody named Ana Caballo at the Florence Immigration Rights Project. That individual signed his application, swearing, as your Honor pointed out, that the contents of the application were read back to Mr. Albarnett in a language with which he understood, and she signed it. The application asked- No, I think my point is that the IJ drew inconsistent findings between what was said in the asylum application and then what was said at the hearing. I think Petitioner's argument is because of the mistranslations at the hearing. And I guess my Honor point, I guess I was hoping to, and I might be inartfully doing it, trying to separate the two and say that even if there may have been some allegations of incompetent translation at the hearing, that there are omissions in the 589. So, in the 589, for instance, your Honor, it says, was your family physically harmed? Were you physically harmed? And in that 589, he says, I was only threatened my home was shot at. Now, before the IJ, he says a completely different story. Whether or not that story, my point being, your Honor, whether or not that conversation before the immigration judge may have some translation issues, he omitted in his 589 that he had been shot at or his mother had been beaten. These are significant inconsistencies. But the mother issue, I think the issue there was that the mother, he had not spoken to the, according to him, he had not spoken to the family before he filed his asylum application and therefore didn't know about his mother's hospitalization. Yes, your Honor. And that is one of the inconsistencies found by the IJ based on how his story evolved. Because in the initial part of the merits hearing, he says, I hadn't spoken to my family for months before. He said, I hadn't spoken to my family since I came to the US. He arrived in the US in about June, 2022. And then later on in his merits hearing, he says, I spoke to my family recently. Even though the immigration judge was asking a different line of questioning, the immigration judge paused and said, well, hold on a second. How come initially you told me you hadn't spoken to your family for several months and now you're saying you spoke to your family just recently? And this is just one of the very many things. So again, under a lamb, the IJ looked at the totality of the circumstances and found that even though this raised some concerns with the IJ, there was a letter from the brother, as your Honor pointed out. This letter from the brother, the IJ found, was produced before the court under mysterious circumstances because the letter was typed with the date of his incident with Dina, as well as the date of the letter were handwritten in. The Arabic original version of the letter was not in the record. And Mr. Albarnet was unable to say where it was or what happened to it. Initially, Mr. Albarnet said that this letter had been DHLed to the brother's friend who lived in California. And then later on in the same hearing, this testimony evolved under further questioning by the DHS attorney. Mr. Albarnet said, well, actually, your Honor, because of timing issues, and I wasn't sure I would be able to submit it on time, the evidence or the letter was submitted by a photograph or a text message to this friend, and that's how it got to me. And again, going back to the timing, Mr. Albarnet had said, I hadn't spoken to my family in months. And then he says, oh, but hold on. On the date of my hearing on August 31st, this letter appeared from the guard from my brother. And so the immigration judge, all of these raised red flags to the immigration judge. And again, remember, your Honor, the standard of review is what would compel any reasonable adjudicator to find, to reach a contrary conclusion. Well, oh, I'm sorry. No, I was just gonna ask you to go into exhaustion, but- Yes. Thank you, Judge. My recollection is that one of the main concerns of the judge in terms of credibility was the fact that in spite of him raising the alleged attack on his mother as significant evidence of what they were about to do to him if he ever showed back up again, this letter from the brother allegedly never mentions that attack. Am I correct? That is correct, Your Honor. In his application, 589 on page 287, he only says his family was shot at. And then later on, he says, my family was on direct examination. My family was hurt. They hit my family. And then he says his mother was hospitalized before the IJ. And again, persecution or harm to a family member is relevant, and the immigration judge found this is something that's significant. It's not an ancillary or corollary omission. This is not a typographical error or an issue with petitioner getting the days of the week of an incident wrong. This is a significant omission that would tend to, at least before the immigration judge, show that he bolstered his claim. It was evidence of completely different allegations. And so that, Your Honor, we argue, substantial record evidence does support that finding for the adverse crediting determination. Can you talk a little bit about exhaustion? So why do you think, in your view, and I understand the argument is in his appeal, in his brief to the BIA, he's discussing translation issues with his asylum application, and then that the IJ didn't give him a chance to give explanations, and the government's attorney made him have yes or no questions, and did not directly raise the issue of translation at the hearing. But we've had cases where we liberally construe the pro se, and they don't mention due process violation, and they say even less, and we have found that the due process claim was exhausted. You know, for example, in, I think, council sites too, well, there's Agamon and Amo, for example, in particular. Why under that liberal construction is it insufficient here to have exhausted, in your view? So, Your Honor, I would say the big distinction in those cases is that there was at least a general reason of the issue, and then that put the BIA, that gave the BIA, that was meaningful notice to the BIA, that general claim or allegation of an error. So, it's not the government's position that we're expecting him to give exact legalese, even though petitioner claims that he's unsophisticated. He submitted a three-page brief to the board, three pages, where he very specifically lays out any, his alleged errors with the board, and, like Your Honor, Justin, just like you pointed out, he talks about the IJ's findings to do with its adverse credibility determination, about the yes or no questions not being able to clarify. That shouldn't be some magic words that automatically trigger a separate issue of incompetent translation before the immigration judge, if that's the case. He very specifically talks about honor killings, which, again, goes towards the agency's adverse credibility determination, and he says in paragraphs three and four, he talks about the translator from the Florence Project in Arizona. If he knew enough to say that the translator issues with preparing my asylum application, then why couldn't he? He could have very well said translation issues with the immigration judge at my merits hearing. He didn't say that. As Your Honor pointed out, in cases this court has said, a pro se petitioner arguments are liberally construed. Going to the Ninth Circuit decisions that were in petitioner's brief, Amo and Agyeman, again, Your Honor, in looking at those, the petitioner made either very broad, the general arguments where they laid out what the issue was. And the Ninth Circuit says, even though they may have been inartful, there still was a challenge. There was enough laid out. But here, there was no mention of the incompetent translation before the IJ. As I said before Judge Sanchez, he said incompetent translation. Amo is a, you know, it's an unpublished case, so we take that with the status that it is. But there, you know, the petitioner in the BIA brief said that he testified honestly and truthfully, answered 400 questions, and answered questions multiple times. And a panel construed that to be sufficient to raise a due process challenge. Whereas here, we have something where he does even bring up translation, just in a different context, plus this difficulty answering questions at the hearing. I mean, if we were to follow Amo, it seems like this would be even more clear than that one. I'm wondering what you think. I see I've run out of time, Your Honor, but may I have permission to answer a question? Because I think Amo is actually a great case for the government, because when you actually look at the board, the agency decisions, the immigration judge decision very specifically, and I pulled up the record in Amo, it very specifically says the IJ goes, as the IJ is running through decision, making findings about past persecution, relocation, and going through all the factors for an asylum claim. The IJ says, petitioner says XYZ in his asylum application, but before the board, at my merits hearing, he's now saying XYZ. And I asked the petitioner, do you understand the translator? And the petitioner says yes. The IJ moves on, talking about another issue. The IJ says his 589 application says XYZ, but here, before the immigration judge, he's saying something completely different. I've stopped the hearing, and I asked the petitioner, do you understand the translator? So in that agency decision, there was specific indicia about that there may have been issues with the translator that would have raised flags before the board upon review that, hey, maybe this pro se alien was not understanding the translator before the immigration judge. In this case, none of that is present, Your Honor. The record is completely, like there's absolutely any mention of the immigration judge asking him, or he doesn't say, oh, I don't understand, where petitioner's questions aren't repeated, there's none of that. And so Amo, I would say, even though, as Your Honor pointed out, it's precedential, and this court should be persuaded, it's very distinct from the facts of our case on that basis. All right, I think we understand the government's position. Any other questions? I think that's a very good point.  I would ask you to deny the petition for review. Thank you. All right, I'm gonna jump right in here because we don't have much time, and get back to this exhaustion question. I mean, I'm thinking about this really carefully because I believe strongly in the general principle that we construe things liberally for pro se litigants because we don't want the legal system to be unfair for folks who don't have any other assistance in getting through this process. But I have to balance that with the rule that there's gotta be enough here for the agency to have seen that there's a problem, or to seen the issue, so that they have fair notice and they have a chance to address the problem. As I'm looking at this brief, which is the part of the record that you pointed me to for a showing of exhaustion, the only thing I see in his brief that talks about his hearing is, quote, during the hearing, I was not allowed my right to clarify my answers. This hurt me because the DHS attorney told me only to answer yes or no to their questions, and when I wanted to clarify, I was not allowed. I objected to this, but still was not allowed to add more information. Nothing else in his brief talks about his hearing. He talks about the application. He talks about pieces of the evidence. That's the only part that talks about his hearing. What from that was the agency supposed to glean in terms of a translation problem? Well, I would respectfully disagree that none of the rest of this brief discusses the hearing because he says repeatedly at other points that the judge didn't listen to me. The judge wouldn't listen. I tried to explain. I tried to explain, and that occurs outside of that one paragraph. I think if one looks at the brief in total, the clear message is an inability to communicate, and in this court, in cases like Aguiman, Dent, and Amo, has required far less of petitioners. Rather, they simply need to raise the issue that they saw, so like the IJ's insistence that his wife come testify at the hearing in Aguiman was found to exhaust the issue of the IJ's failure to explain the proper procedures to him, and again, this all has to be considered from the standpoint of the petitioner who he's presented with the English language transcript, and all he has is the fact he knows he couldn't communicate, and I think that if this isn't enough to exhaust, then I think that exhaustion is perhaps impossible in these circumstances, because I don't know what else the petitioner could have done. If he had the English language transcript, he didn't speak English, and he had his experiences in the hearing, which is that he tried to explain himself, and he wasn't able to make himself understood. He certainly could have written a brief that didn't exhaust these issues. Had he attacked the IJ's reliance on various factors or said the IJ applied the wrong legal standard, then I wouldn't be here arguing that he exhausted the translation issue, but I think he put the issue before the court, before the BIA of his inability to communicate as clearly as he could, and I think it was clear enough through the repetition of the phrases we pointed out in our brief and through the overarching theme of the inability to communicate that I think he did exhaust this issue, and I think the fairest remedy here would be for this court to remand with instructions for a new hearing at which Petitioner would have the opportunity for a full and fair hearing with competent translation to make his best case to be allowed to stay here in the United States, which he asked to be allowed to do even in jail rather than being sent home. Any other questions for Petitioner? All right, thank you very much. Thank you. Again, I want to thank counsel for your helpful argument in this matter, which is now submitted for decision, and again, also note that Petitioner's counsel here today is acting pro bono, and we appreciate your service.
judges: FORREST, SANCHEZ, Ezra